**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 25-5046 consolidated with 25-5047

# In the United States Court of Appeals for the District of Columbia Circuit

AIDS VACCINE ADVOCACY COALITION AND JOUNRALISM
DEVELOPMENT NETWORK, INC.,
*Plaintiffs-Appellees,*

*v.*

U.S. DEPARTMENT OF STATE, *et al.,*
*Defendants-Appellants*

GLOBAL HEALTH COUNCIL, *et al.,*
*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES OF AMERICA, ET AL.,
*Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Columbia

**APPELLEES' JOINT OPPOSITION TO APPELLANTS' MOTION FOR
A STAY PENDING APPEAL AND CROSS-MOTION TO DISMISS**

Allison M. Zieve
Lauren E. Bateman
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
Tel: (202) 588-1000
azieve@citizen.org
*Counsel for Plaintiff-Appellees AIDS
Vaccine Advocacy Coalition, et al.*

William C. Perdue
Sally L. Pei
Samuel L. Witten
Stephen K. Wirth
Dana Kagan McGinley
Allison Gardner
Daniel Yablon
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
Stephen.Wirth@arnoldporter.com
*Counsel for Global Health Counsel et al.*

## INTRODUCTION

After flouting the district court's temporary restraining order for a full twelve days in letter and in spirit—requiring the district court to not once, not twice, but three times order compliance—Defendants bring this premature appeal in a last-ditch effort to evade the order of an Article III court. This Court should swiftly reject Defendants' latest stalling tactic, deny their stay motion, and dismiss the appeal for lack of jurisdiction.

This case concerns the government's abrupt and arbitrary freeze of foreign-assistance funding. Implemented overnight through a series of agency memoranda, the funding freeze upended hundreds of humanitarian projects administered by longstanding private partners of the United States Agency for International Development (USAID) and Department of State. By halting disbursements to Plaintiffs—American businesses and nonprofits—even for work *they had already performed, and which already had been reviewed and cleared for payment*, the funding freeze plunged Plaintiffs into sudden financial turmoil. Without funds to meet their operating expenses, which in many cases they must continue to incur under the terms of their awards, the funding freeze has left them facing imminent collapse. Already, Plaintiffs have had to furlough or lay off thousands of American workers. In the coming days,

1

they will suffer terminations of credit lines, evictions, insolvency, lawsuits from vendors and others for work performed, and other irreparable harm that threaten Plaintiffs' very existence. Meanwhile, many of those who depend on their programming face starvation, disease, and death. And Defendants implemented that arbitrary and unconstitutional policy without so much as acknowledging the grave reliance interests at stake.

On February 13, 2025, after an adversarial hearing, the district court found that Plaintiffs had established the requirements for a temporary injunction, and it temporarily restrained the government from implementing the blanket freeze of foreign-assistance funding pending preliminary injunction proceedings that are ongoing. After Plaintiffs presented evidence that the government failed to comply with the TRO, the district court again ordered compliance on February 20 and 21. In response, the government continued its non-compliance and sought "clarification" of the order, which was already clear. When the government's failure to unfreeze funds threated the imminent insolvency of some Plaintiffs, the district court held another emergency hearing, seeking information from the government on its compliance efforts, which was not forthcoming, resulting in the February 25 minute order at issue here.

The government's latest effort to skirt a binding judicial decree through this appeal is both procedurally improper and legally unsound. First and foremost, as this Court recently reiterated in rejecting the government's similar premature appeal in another case, "[p]reliminary injunctions are appealable, but TROs generally are not." *Hampton Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *4 (D.C. Cir. Feb. 15, 2025) (dismissing appeal and denying motion to stay as moot). The purpose of a TRO is to preserve the status quo to enable orderly adjudication. The government's eleventh-hour appeal defies that jurisdictional rule, asking this Court to weigh in on issues the district court has not yet had the opportunity to decide (and the government did not timely raise) without full factual development from the ongoing preliminary injunction proceedings.

Second, even if this Court had jurisdiction to hear the appeal, the government would not be entitled to the relief it seeks. Review under the Administrative Procedure Act of agency actions dictating grant and contracting policy is entirely routine. And under the APA's familiar standard, agency actions that fail to grapple with important aspects of the problem, like the challenged actions here, are arbitrary and capricious. Beyond that, the government has woefully failed to show any irreparable harm from the order

enjoining implementation of the chaotic funding freeze, whereas the irreparable harm to Plaintiffs has been proven and is only mounting.

At bottom, the government is not above the law, and the Court should not countenance the utter disregard of an Article III court's orders. The appeal should be dismissed and motion to stay denied.

## STATEMENT

On the day he took office, President Trump issued an executive order directing a wholesale freeze of congressionally appropriated foreign-assistance funding to "align[]" that funding "with the foreign policy of the President." Exec. Order No. 14,169 at § 2, 90 Fed. Reg. 8619 (Jan. 20, 2025). To implement that directive, the Secretary of State and officials at the United States Agency for International Development (USAID) issued a series of agency memoranda immediately halting all such funding pending review.[1]

---

[1] *See Memorandum from the Secretary of State*, 25 STATE 6828 (Jan. 24, 2025) (Rubio Memo); USAID, *Notice on Implementation of Executive Order on Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (Rodgers Guidance); USAID, *Initial Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid* (Jan. 22, 2025) (Gray Initial Instructions); USAID, *Follow-Up Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (Gray Follow-Up Instructions); USAID, *Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid* (Jan. 26, 2025) (Gray Clarification).

Abruptly cutting off all funding for humanitarian projects, those actions plunged implementing partners, their employees, and the individuals who depend on them into chaos. As the district court found, Plaintiffs—American companies and nonprofits that have partnered with USAID and the Department of State for decades—face extraordinary and irreparable harm that threatens their very existence. Most have had to furlough or lay off vast numbers of employees, and with creditors' patience waning, imminently face cancelation of credit lines, civil and regulatory actions for employment violations, evictions, and even bankruptcy because they cannot meet their operating expenses.

Plaintiffs in the two cases below each filed suit asserting Administrative Procedure Act and constitutional violations and sought a temporary restraining order and preliminary injunction. After an adversarial hearing, the court found that Plaintiffs had established a likelihood of success on their claim that the funding freeze was arbitrary and capricious and met the other requirements for preliminary relief. *See Global Health Council v. Trump*, No. 1:25-cv-00402 (*GHC*), ECF No. 21 (Feb. 13, 2025). The Court entered a temporary restraining order enjoining Defendants from implementing the challenged agency actions by, among other things, "suspending, pausing, or

5

otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *Id.* at 14.

The Court also entered a scheduling order for preliminary injunction proceedings that substantially adhered to Defendants' proposed schedule, directing that Plaintiffs' reply be filed by February 27, 2025—only one day after the date Defendants had requested. *GHC*, Minute Order (Feb. 14, 2025); *see also GHC* ECF No. 23 (Feb. 14, 2025).

Since then, Defendants have abjectly defied the court's temporary restraining order. In the twelve days since it issued, they had not disbursed a single dollar to Plaintiffs or other implementing partners in response to the TRO; have imposed further obstacles to obligation and disbursement; and have issued blanket contract and grant terminations citing Executive Order 14169 as authority.

On February 20, following adversarial briefing, the court granted in substantial part Plaintiffs' motion to enforce the TRO in related case *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, No. 25-cv-400 (D.D.C.) (*AVAC*), Dkt. No. 30 (Feb. 20, 2025); *GHC*, Dkt. No. 28 (Feb. 20,

6

2025). As the court explained, "the TRO is clear." It reiterated that the order prohibited Defendants from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." The next day, the court denied without prejudice as moot Plaintiffs' motion to enforce the TRO in *GHC*, explaining that, under the court's orders, Defendants "are to immediately cease [the blanket suspension of funds] and to take all necessary steps … disburse all funds" payable under Plaintiffs' award documents. *GHC*, Minute Order (Feb. 21, 2025) (alteration in original and citation omitted).

Unsatisfied with that result, Defendants sought "clarification." *GHC* ECF No. 34 (Feb. 21, 2025). And the court again reiterated: "The line here is unambiguous. Defendants cannot continue to suspend programs or disbursements based on the blanket suspension that was temporarily enjoined." *GHC* ECF No. 35, at 2–3 (Feb. 22, 2025). As the court explained, the TRO's effect was "to restore the status quo as it existed before Defendants' blanket suspension of congressionally appropriated funds." *Id.* at 2.

Still, Defendants took no action whatsoever to comply with the TRO's

7

requirement that they lift the funding freeze the court found was likely unlawful. With several Plaintiffs on the verge of insolvency without their funding, Plaintiffs again moved to enforce the TRO, but limited the emergency relief to disbursements for work already completed before the funding freeze took effect. *GHC* ECF No. 36. After government counsel could not identify *any* action the government had taken to unfreeze funds, the court again ordered the Defendants to comply with the TRO it had issued nearly two weeks before. *GHC*, Minute Order (Feb. 25, 2025); *see GHC* ECF No. 37, at 35:25–36:19 (Feb. 25, 2025) (offering no answer to the court's question of "whether any funds that you've kind of acknowledged are covered by the Court's order have been unfrozen"). Specifically, the court directed that "[b]y 11:59 p.m. on February 26, 2025, the restrained defendants shall pay all invoices and letter of credit drawdown requests on all contracts for work completed prior to the entry of the Court's TRO." *GHC* ECF No. 37, at 57:25–58:12.

Defendants noticed an appeal from the district court's minute order, and—in the early morning hours of the day by which the court had ordered them to comply—sought an emergency stay pending appeal.

## ARGUMENT

For twelve days, Defendants have stonewalled and abjectly defied the district court's unambiguous temporary restraining order. Now that the court has ordered compliance by a date certain, Defendants for the first time on appeal assert that compliance will not be possible for weeks to come. That assertion—which Defendants had every opportunity to make before the district court, but did not—simply beggars belief. This is not a question of payment volume or velocity. Defendants have disbursed essentially *no funds* since the district court ordered them to lift the unlawful funding freeze. And any purported impediments to unfreezing payments are of the government's own making. It should not benefit from its "ready, fire, aim" chaotic effort to arbitrarily dismantle foreign-assistance programs.

The general rule that temporary restraining orders are not appealable serves to safeguard against exactly this sort of gamesmanship and disruption of the orderly adjudicatory process. The Court should not countenance Defendants' latest effort at delay while Plaintiffs' irreparable harms continue to mount. It should deny the stay application and dismiss the appeal for lack of jurisdiction.

## I.   The Court Should Dismiss Defendants' Appeal For Lack Of Jurisdiction

This Court lacks jurisdiction over an appeal from a TRO. As this Court reiterated just two weeks ago in rejecting a similarly premature appeal, "TROs generally are not" appealable. *Dellinger v. Bessent*, No. 25-5028 (D.C. Cir. Feb. 15, 2025), 2025 WL 559669, at *4. "[T]here is no statutory provision for the appeal of a temporary restraining order." *Id.* (quoting Wright & Miller, Fed. Prac. & Proc. Civ. § 2951 (3d ed. June 2024 update); *see also Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) ("The grant of a temporary restraining order under Rule 65(b), Fed. R. Civ. P., is generally not appealable."). And here, the government seeks something even more extraordinary than appellate review of a TRO itself. It seeks review of an order directing Defendants simply to take steps to comply with a TRO. The government does not point to a single source of authority to suggest that this Court—or any other federal court of appeals—has determined that jurisdiction lies from such an appeal. And it bears the burden to establish this Court's appellate jurisdiction. *Dellinger*, 2025 WL 559669, at *5; *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Sound reasons underlie the rule barring interlocutory review of a TRO. Permitting appeals of a TRO—and certainly an order, like the one challenged

10

here, that merely sets a date for compliance with a subset of the temporary relief the court has already ordered—frustrates "congressional policy against piecemeal review." *Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d 1258, 1261 (D.C. Cir. 2012) (quoting *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981)). And it asks this Court to "prejudge[] … significant issue[s]" that the district court has had no opportunity to decide on an incomplete record. *Dellinger*, 2025 WL 559669, at *5.

And newly imposed approval processes at USAID are creating an artificial bottleneck that will only serve to slow disbursements to a standstill. Since the TRO, USAID has restricted the processing of all USAID payments to limited personnel in five regional hubs: Jordan, Ghana, South Africa, San Salvador, and Bangkok. Decl. of Zan Northrip ¶ 8, *GHC* ECF No. 36-2.  As of a week ago, South Africa now has only "*five employees* to examine and certify vouchers for *16 countries*" (whereas South Africa "usually has 20 employees … who process vouchers for six countries"). Decl. of Emilia Doe ¶ 15, *Am. Fed. Gov't Empls. v. Trump*, No. 25-cv-352 (D.D.C. Feb. 17, 2025), ECF No. 36-3 (emphasis added). Only 50 people worldwide are able to process payments using USAID's payment system, known as Phoenix. *Id.* And now *every* payment request—including for existing awards and for work already

11

performed—must be individually approved by a single political appointee in Washington: Assistant to the Administrator for Management and Resources Ken Jackson. Northrip Decl. ¶ 8.

That number may be lower now, as Defendants have been terminating USAID's personnel in just the last few days. The agency's website—www.usaid.gov—has been replaced with a "Notification of Administrative Leave" and information for how personnel can recover personal belongings left in the Reagan Building before they were suddenly and without warning locked out. The notification provides: "As of 11:59 p.m. EST on Sunday, February 23, 2025, all USAID direct hire personnel, with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, will be placed on administrative leave globally."

Needless to say, the district court is best positioned to weigh conflicting evidence in the first instance, and this Court's intervention "would throw a monkey wrench into the district court proceedings." *Dellinger*, 2025 WL 559669, at *5.

All of the factors the Court identified in *Dellinger* support dismissing this appeal. The government expressly asks this Court to make merits

12

determinations about what it acknowledges (at 13) is "an intricate statutory scheme," essentially seeking a final adjudication of weighty legal issues in a posture where Plaintiffs have less than 12 hours to respond. *See Dellinger*, 2025 WL 559669, at *5. To support its claim of irreparable harm, the government makes untested (and disputed) assertions about the agency decisionmaking process, the information supporting implementing partner invoices, and the government's ability to recover disbursed funds. *See* App. 225–30; *Dellinger*, 2025 WL 559669, at *5 (observing that accepting "a party's bare assertion of 'extraordinary harm'" as ground for appeal would "incentivize more requests for two-day rulings"). And the district court set a briefing schedule for the preliminary injunction substantially identical to what Defendants' requested and has repeatedly indicated it would rule with "expedition." *Dellinger*, 2025 WL 559669, at *5; *see GHC*, Minute Order (Feb. 14, 2025).

The government is also mistaken (at 21) that its "rights will be irretrievable lost absent review." *Berrigan v. Sigler*, 475 F.2d 918, 919 (D.C. Cir. 1973). All the district court's order does is preserve the status quo ante the unlawful funding freeze adopted last month. For *decades*, the government has obligated and disbursed congressionally appropriated foreign-assistance

with extraordinarily low rates of improper payments and successfully recovered substantially all funds that were disbursed in error. *GHC* ECF 29, at 10–11 & n.7. And as the district court found, and the government does not dispute, its novel blanket funding freeze imminently threatens the very existence of its longstanding implementing partners. *GHC* ECF 21, at 5–8. Preserving that status quo pending an orderly determination of Plaintiffs' motion for a preliminary injunction falls well within the proper bounds of a temporary restraining order.

## II.    Defendants Are Not Entitled To A Stay

Even if this Court had jurisdiction, Defendants would not be entitled to a stay. A stay pending appeal is "an exercise of judicial discretion," and "is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citations omitted). In assessing whether Defendants have met that stringent standard, the Court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (citation omitted). Defendants satisfy none of those criteria.

### A.    Defendants Have Made No "Strong Showing" That They Are Likely To Succeed On The Merits

Defendants advance three arguments for why they should prevail on the merits, but none of these underdeveloped positions withstands even cursory scrutiny, much less provides a basis to upend the ordinary adjudicatory process.

*First*, Defendants are wrong (at 9–13) that the temporary restraining order usurps the President's authority to faithfully execute the laws—a nonjurisdictional argument that they never advanced below. Tellingly, they cite zero authority for the proposition that an order that might require the government to release congressionally appropriated and obligated funds somehow intrudes on executive-branch prerogatives. But both the Supreme Court and this Court have held that the APA permits specific relief that "may obligate the United States to pay the complainant." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)); *see Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988) (suit to enforce mandate that government "'shall pay' certain amounts for appropriate Medicaid services, is not a suit seeking money in *compensation* for damage" and is permissible under the APA (quoting 42 U.S.C. § 1396b)).

15

That agency leadership have raised "questions about waste fraud, abuse, and even illegal payments," Mot. 10 (citation omitted), does not exempt agency actions from judicial review or transform an otherwise permissible order into a separation-of-powers problem. To the contrary, *Crowley* involved a purported "audit" of a contractor's invoices—agency action the Court held a court would have authority declare unlawful and enjoin. *Crowley*, 38 F.4th at 1103, 1111. The government's position would defeat the APA's presumption of judicial review every time an agency shouted "fraud!". No precedent supports that outcome, and the government cites none.

And Defendants' assertions that foreign-assistance payments lack "integrity" is utterly farcical and supported by no evidence or reasoning. To begin, Defendants have identified no evidence whatsoever that any paused or delayed disbursement—to Plaintiffs, their members, or any other implementing partner—would be fraudulent. Moreover, the agencies already have mechanisms to protect against fraud, waste, and abuse. For example, USAID has adopted comprehensive guidance governing the process by which it disburses funds to implementing partners, including detailed protocols to prevent fraudulent or otherwise improper payments. *See* USAID, Automated Directive System chs. 630 & 636 (rev. 2019). In fiscal year 2024, for example,

USAID made $4.04 million in overpayments (out of an agency budget of $40 billion), of which all but $80,000 were recovered by the agency—a recovery rate of 97.95%, which is higher than that of nearly every other agency.[2] In addition, the Payment Integrity Information Act of 2019, Pub. L. 116–117, requires agencies to "assess the risk of, estimate, report, reduce, and recover improper payments," and in the most recent fiscal year, an independent accountant found that USAID and all of its programs were "in compliance." USAID, Office of Inspector Gen., USAID Complied with the Payment Integrity Information Act of 2019 for Fiscal Year 2023, Report 0-000-24-006-C (May 28, 2024). And each entity receiving $1 million or more in federal funding must also undergo an audit and share the findings of the audit with each federal funding source. *See* 2 C.F.R. § 200.501.

Moreover, Defendants' supposed interest in combatting fraud is belied by other actions they have taken to implement the funding freeze. As reported by the USAID Inspector General, "staffing shortages and limitations on communications with aid organizations stemming from the cessation of U.S. foreign assistance have limited USAID's ability to receive, react to, and report

---

[2] *See* PaymentAccuracy.gov, *Annual Improper Payments Datasets*, https://www.paymentaccuracy.gov/payment-accuracy-thenumbers/.

allegations of diversion." USAID, Office of Inspector Gen., *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* (Feb. 10, 2025). Defendants fired the Inspector General immediately after this report was released. *See* Ellen Knickmeyer, *White House fires USAID inspector general after warning about funding oversight, officials say*, AP (Feb. 11, 2025), https://apnews.com/article/usaidamerican-companies-layoffs-lawsuit-8c116d877c179169fbce2d3348fcd997.

*Second*, neither the Contract Disputes Act nor the Tucker Act divested the district court of jurisdiction. At the outset, Defendants openly acknowledge that even claims asserted under many of Plaintiffs' individual award documents would lack a home in the Court of Federal Claims. *See* Mot. 15 ("*To the extent that some of the funding instruments at issue in this case are procurement contracts*, any dispute about payment … would be governed by the Contract Disputes Act … . (emphasis added); *id.* ("For other instruments, the Tucker Act *may* provide a remedy … . (emphasis added)). But many Plaintiffs and their members are not contractors (much less *procurement* contractors), and they include those operating under cooperative agreements and subawards to whom neither the CDA nor Tucker Act apply.

*See United States Enrichment Corp. v. United States*, 117 Fed. Cl. 548, 553 (2014); *see, e.g.*, *GHC* ECF 7-3, ¶¶ 8, 22 (cooperative agreements); *GHC* ECF 7-4, ¶ 4 (cooperative agreements, sub-agreements); *GHC* ECF 7-5, ¶ 5 (cooperative agreements); *GHC*, Dkt. 7-1, ¶ 10 (cooperative agreements); *GHC* ECF 7-8, ¶¶ 7-8 (prime cooperative agreements, subawards, subcontracts); *GHC* ECF 7-9, ¶ 7 (subawards). The district court needed jurisdiction only over a single Plaintiff's claims to review the challenged agency actions under the APA and to set those actions aside. *See, e.g.*, *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004). Defendants' failure to even contend that *all of them* should have proceeded in the Court of Federal Claims is reason enough to conclude Defendants are unlikely to succeed on this point.

In any event, Plaintiffs do not assert claims for breach of the terms of their individual awards, and so neither the CDA nor Tucker Act affect where they may file. As the district court observed in denying the government's request for a stay, "Defendants' instant motion does not meaningfully engage with the large body of precedent on this question." GHC ECF No. 41, at 5. Under both the Tucker Act and Contract Disputes Act, the critical inquiry is whether a claim "is *at its essence* a contract claim." *Crowley*, 38 F.4th at 1106

(quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see A&S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995) (applying the *Megapulse* standard to the Contract Disputes Act). And neither "the source of rights" upon which Plaintiffs base their claims nor "the type of relief sought" sound in contract. *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 967). From the outset, Plaintiffs challenged Defendants' sweeping agency actions: memoranda that froze foreign assistance funding wholesale *rather* than relying on any individualized determinations. *See, e.g.*, Compl. ¶ 96-97, *GHC* ECF No. 1. The remedies Plaintiffs seek, too, are those quintessentially available under the APA and not in contract—vacatur and an injunction against implementing those unlawful agency actions, including by "freezing, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds." *GHC* ECF No. 4-1, at 1–2.

To the extent that this case "has gone terribly off track" and become "an agglomeration of countless individual breach-of-contract suits," Mot. 13, that is a problem entirely of the government's own making. After the district court entered its TRO, *Defendants* sought to justify their continued noncompliance based on a series of *en masse* award terminations that the district court all but found represented "a post hoc rationalization." *GHC* ECF No. 37, at 40:10–23.

20

But those terminations are not the subject of the limited order that Defendants now appeal. That order directed compliance with the TRO *only* as to payments "for work completed prior to the entry of the Court's TRO"—that is, work performed *before* the terminations. *Id.* at 57:25–58:15. Regardless, the Court of Federal Claims' exclusive jurisdiction turns only on "the face of the complaint," not whether an asserted defense might "require[] some reference to or incorporation of a contract." *Crowley*, 38 F.5th at 1107–08.

*Third*, sovereign immunity presents no obstacle to Plaintiffs' claims. As discussed above, neither the CDA nor Tucker Act displace the APA's waiver here. And to the extent the government suggests (at 14) that the TRO exceeds that waiver by awarding money damages, the Supreme Court's decision in *Bowen* squarely forecloses that position. There, the Court allowed an injunction under the APA compelling the government to release grant funds wrongfully withheld. *Bowen*, 487 U.S. at 910. The Court held that such an order was "for specific relief … rather than for money damages" because it directed the disbursement of specific funds rather than awarding compensation. *Id.* Thus, it was "within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id.*

21

**B.      Defendants Will Not Be Irreparably Harmed Absent A Stay**

The government's position calls to mind "the old saw about the child who murders his parents and then asks for mercy because he is an orphan." *Fog Cutter Cap. Grp. Inc. v. SEC*, 474 F.3d 822, 826 (D.C. Cir. 2007).  To prove irreparable harm, a party must show harm that is "both certain and great" and "actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985). Equally importantly, the harm must "directly result from the action" at issue and "cannot arise from the [party]'s own actions." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 33 (D.D.C. 2014) (quotation marks omitted). Indeed, "it is well-settled that a [party] does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Ardelyx, Inc. v. Becerra*, No. 24-CV-2095 (BAH), 2024 WL 5186613, at *11 (D.D.C. Dec. 20, 2024) (cleaned up). A party cannot "be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).

To begin, the Defendants' claimed harms are entirely self-inflicted. Defendants complain  (at 21–22) that if they pay Plaintiffs on invoices that are already approved for work already completed, *and* those invoices turn out to be fraudulent, *then* it might not be able to recover those funds, *if* Plaintiffs spend them too quickly. But the only reason Plaintiffs are in the desperate

position they are in now is because the government has driven them nearly into insolvency—first by adopting the policies that the district court found are likely arbitrary and capricious, and then by refusing to take any action whatsoever to comply with the court's temporary restraining order in the nearly two weeks it has remained in force. The government should not be rewarded with a stay for its flagrant defiance and intransigence.

In any event, as a matter of fact, the government's fears are unfounded. As discussed above, independent audits show USAID has extremely low rates of overpayments and extremely high rates of recovering any improperly disbursed funds. Defendants' unsupported assertion (at 10) that there are "questions" about fraud falls far short of justifying extraordinary emergency relief.

### C.   The Equities Disfavor Defendants' Eleventh-Hour Application

The equities strongly disfavor Defendants' last-minute attempt to derail orderly adjudication after ignoring the district court's order for *twelve days*. As the district court found in denying Defendants' stay application, "Defendants have had nearly two weeks to come into compliance, apparently without taking any meaningful steps to unfreeze funds." *GHC* ECF No. 41, at 3–4. Nor did Defendants difficulties complying with the Court's deadline "at

23

the hearing or any time before filing their notice of appeal," "even though Plaintiffs' motion to enforce explicitly proposed compliance on this time frame." *Id.* at 3. In any case, the balance of equities would overwhelmingly favor Plaintiffs, who, as the district court found, imminently face staggering and irreparable harms.

*First*, it is difficult to overstate the level of defiance that prompted the district court's order directing compliance by a date certain. In the days following the TRO, Defendants issued no guidance to agency personnel about how they should comply with the court's unambiguous order barring them from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds." *GHC* ECF No. 21, at 14; *see GHC* ECF No. 29-3, at 1–2; *GHC* ECF No. 29-5, at 2–3. Instead, per internal agency correspondence, the Secretary of State issued an *additional* "15-day disbursement pause" on all State Department grants. *GHC* ECF No. 29-1, at 1. Meanwhile, Defendants apparently imposed additional barriers to payments, including stripping line-level officers most familiar with the relevant awards of authority to make disbursements and channeling purported "review" of payments through a handful of political appointees. *See, e.g.*, Decl. of Ellie Doe ¶¶ 9–15, *GHC* ECF No. 42-3; Decl. of Della Doe ¶¶ 7–

24

11, *GHC* ECF No. 42-2; Decl. of Clara Doe ¶¶ 11–15, *GHC* ECF No. 42-4;
Northrip Decl. ¶ 8, *GHC* ECF No. 29-6; *see also* Second Marocco Decl., Ex. C,
*GHC*, ECF No. 39-1; Mot. to Enforce at 7, *GHC* ECF No. 29 (describing
artificial bottleneck). On top of barriers within the agencies, public reporting
reflects that even payments apparently approved under the agency's all-but
illusory waiver process were "veto[ed]" by detailees from the U.S. DOGE
Service.[3] And Defendants started papering over the blanket funding freeze the
district court had restrained with hundreds of individual terminations made in
"tranches" apparently based on, at most, a single line of justification. *See* Decl.
of Dunn-Georgiou ¶ 3, *GHC* ECF No. 29-1.

At the district court's February 25 hearing, government counsel could
not identify a *single* action Defendants had taken in the twelve days since the
TRO to unfreeze frozen funds, outside the purported waiver process under
which no payments had been made. Critically, as of the government's stay
motion, Defendants had not disbursed *a single dollar* of the funds the district
court had ordered unfrozen twelve days earlier. This is not a question, as
Defendants contend (at 7), of withholding payments that are somehow not

---

[3] *See* Matt Bai, *The Blinding Contempt of the DOGE Bros*, Wash. Post (Feb. 24, 2025), https://bit.ly/3D3TnJH.

proper "while resuming those that are." Defendants continue to block all disbursements categorically.

Defendants' suggestion that the relief the court ordered by midnight tonight somehow came as a surprise is fanciful. In its TRO, the court restrained Defendants from implementing the challenged agency actions by, among other things, "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds" in connection with awards in place before the freeze. *GHC* ECF 21, at 14. That is *exactly* the relief Plaintiffs sought at the outset, and exactly what the court repeatedly ordered Defendants to comply with repeatedly following the TRO. *See GHC* ECF No. 4-1, at 1–2; *GHC*, ECF No. 28 (ordering that Defendants restrained from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025."); *GHC*, Minute Order (Feb. 21, 2025) (ordering that Defendants "are to immediately cease [the blanket suspension of funds] and to take all necessary steps … disburse all funds");  *GHC* ECF No. 35, at 2–3 (ordering that Defendants "cannot

continue to suspend programs or disbursements based on the blanket suspension that was temporarily enjoined).

To the extent Defendants now claim that they cannot comply because disbursing payments "would take multiple weeks," App. 222, that assertion is implausible and is one they never made to the district court in the twelve days the TRO has been in effect. Since the court entered its TRO, Defendants have put in five different filings in that court. *See GHC* ECF Nos. 23, 25, 33, 34; *AVAC* ECF No. 28. *Not once* did Defendants raise the prospect that compliance during the TRO's duration would be impossible. Nor did government counsel raise that issue during the hearing the district court held on Plaintiffs' motion to enforce seeking precisely the relief the court ordered. *See GHC* ECF No. 37. The court could—and would—have considered these arguments had the government raised them. *See* GHC ECF No., at 3. In any event, it makes no sense that the State Department and USAID—which have had no trouble timely disbursing payments for decades before the unlawful funding freeze—would now be unable to do so, but for Defendants' deliberate efforts to halt payments. The need for factfinding on these disputed questions illustrates why proceedings should proceed in an orderly fashion in the court

27

that has heard the government's arguments—and evidence—over the past two weeks.

*Second*, the balance of equities would favor Plaintiffs even absent Defendants' undue delay. As the district court found, Plaintiffs, their employees, and those who depend on Plaintiffs' programming would face extraordinary and irreversible harm if the funding freeze continues.

### D.    A Stay Would Be Contrary To The Public Interest

Defendants make no argument about how the public interest favors their requested stay at all. It was their burden to do so. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). This failure is an independent reason to deny their motion.

Even if Defendants had made a showing on this factor, they would still lose on it. The public interest overwhelmingly counsels against a stay here. The government has no interest in "perpetuat[ing] . . . unlawful agency action." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). And the public has a strong interest in "ensuring that government agencies conform to the requirements of the APA" and other federal laws. *Gulf Coast Mar. Supply, Inc. v. United States*, 218 F. Supp. 3d 92, 101 (D.D.C. 2016), *aff'd*,

867 F.3d 123 (D.C. Cir. 2017). So, in cases like this, the public interest "rises and falls with the strength of the moving party's showing on the merits." *Hanson v. District of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (per curiam) (citation omitted). As the district court already found, Defendants likely violated the law here. The public interest thus favors denying a stay, allowing the district court to enjoin Defendants' unlawful actions.

A stay would also have visceral impacts on the public. Plaintiffs have submitted unrebutted evidence that Defendants' actions bring their very existence—and the existence of fellow foreign-aid partners—to the brink. This industry-wide extinction is sure to have devastating and far-reaching effects on the American economy. *See, e.g.*, *GHC* ECF No. 4 at 35–36. Plaintiffs' work is also valuable independent of its economic worth. It advances U.S. interests abroad and improves—and, in many cases, literally *saves*—the lives of millions of people across the globe. In doing so, it helps stop problems like disease and instability overseas, before they reach our shores. Defendants actions are rapidly bringing Plaintiffs' work, and its benefits, to crashing halt. *See, e.g.*, id. at 36–37. Food rotting, Americans out of work, businesses ruined, and critical medical care withheld. *See, e.g. id.* at *GHC* ECF No. 1 at 19–24. These are the fruits of Defendants' actions; their motion—like the arbitrary agency actions

challenged in this case—grapples with none of them.

## CONCLUSION

For the foregoing reasons, the Court should deny a stay and dismiss the appeal for lack of jurisdiction.

Dated: February 26, 2025

Allison M. Zieve
Lauren E. Bateman
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
Tel: (202) 588-1000
azieve@citizen.org

*Counsel for Plaintiff-Appellees*
*AIDS Vaccine Advocacy Coalition,*
*et al.*

Respectfully Submitted,

*/s/ Stephen K. Wirth*

William C. Perdue
Sally L. Pei
Samuel M. Witten
Stephen K. Wirth
Dana Kagan McGinley
Allison Gardner
Daniel Yablon
ARNOLD & PORTER
    KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
stephen.wirth@arnoldporter.com

*Counsel for Plaintiff-Appellees*
*Global Health Council et al.*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 27 and Circuit Rule 27(c) , that the foregoing opposition contains 6,322 words, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

Dated: February 26, 2025                    Respectfully submitted,

                                            /s/ Stephen K. Wirth
                                            Stephen K. Wirth

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2025, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 26, 2025               Respectfully submitted,

                                       /s/ Stephen K. Wirth
                                       Stephen K. Wirth

32